Fabricant, J.
INTRODUCTION
This case raises an issue regarding the interaction between the Education Reform Act of 1993 and the Collective Bargaining Agreement between Lowell and its teachers, with respect to transfers of teachers between schools within the Lowell system. The case is presently before the Court on the parties’ cross-motions for summary judgment. For reasons that will be explained, the plaintiffs motion is denied, and the defendant’s motion is allowed.
FACTUAL BACKGROUND
The defendant Union is the recognized representative of Lowell public school teachers. Lowell and the Union are parties to a Collective Bargaining Agreement. The current agreement was executed on May 10, 1995, and covers the period from July 1, 1994, through June 30, 1997. Article XXVIIIA of the Agreement, as amended on October 12, 1995, governs voluntary transfers. It provides:
1.All teaching vacancies which arise between May 16 of one school year to April 30 of the next school year shall be posted in the May 1 Compendium. Additions and/or deletions to the May 1 Compendium shall be posted as they arise in an Addendum prior to May 15.
2. Requests for transfer shall be submitted in writing and renewed annually no later than May 15 to the Superintendent. Request shall include the grade and/or subject area and school(s), in order of preference, to which the teacher seeks assignment. Only permanent teachers are eligible for transfers.
3. When a transfer is to be made, a teacher’s background, certification, quality of teaching performance, skills required by the job, and length of service in the Lowell school system shall be considered. If all other variables are equal, length of service in the system shall be the controlling factor.
4. All teachers requesting a transfer shall receive a written statement as to the disposition of their request by June 30. Only one transfer per teacher can be honored for a given school year.
All positions that become vacant after May 15 or any positions that are created after May 15 shall be filled by long-term substitutes and these positions shall appear on the May 1 Compendium of the following year,
5. Decisions by the Superintendent, or his designee, are final, unless arbitrary or capricious.
Some time prior to August 28, 1996, Lowell posted certain teacher vacancies, pursuant to Part 1 of Article XXVIII A. Four teachers submitted requests for transfer, pursuant to Part 2. In each case, the principals of the schools in which the vacancies existed denied the requests for transfer, and the superintendent, upon the Union’s request for review, upheld the decisions of the principals. At least some of the vacancies were filled with outside hires, despite the requests of teachers already in the Lowell system to fill the positions by transfer. The Union then filed a grievance with the School Committee, pursuant to the grievance provisions of the collecting bargaining agreement. On September 26, 1996, the School Committee, relying on G.L.c. 71, §59B, as amended by the Education Reform Act, determined that the dispute was not subject to those grievance procedures, and refused to conduct a grievance hearing. The Union responded with an additional grievance based on that refusal, and, on November 19, 1996, referred the matter to arbitration. The American Arbitration Association docketed the matter and appointed an arbitrator.[1] Lowell filed this action on December 10, 1996, pursuant to G.L.c. 150C, §2(b), seeking an order of this Court staying the arbitration on the ground that “the claim sought to be arbitrated does not state a controversy covered by the provision for arbitration.” On January 23, 1997, the Union filed its answer and counterclaim, seeking an order directing the City to proceed with the arbitration.
*592 DISCUSSION
This Court grants summary judgment where the record establishes that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and that it is entitled to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989).
In this case, as the parties agree, no dispute of fact exists with respect to the issues before the Court.[2] The case presents solely the legal question of whether Article XXVIIIA of the Collective Bargaining Agreement is enforceable in light of §59B of G.L.c. 71, as amended by the Education Reform Act. If the two are in conflict, then the latter prevails. School Committee of Natick v. Education Association of Natick, 423 Mass. 34, 39 (1996); see G.L.c. 150E, §7(d). If the conflict is so complete that “no lawful relief could conceivably be awarded by an arbitrator" pursuant to the Collective Bargaining Agreement provision, then the dispute is not subject to arbitration, and the Court must stay the arbitration. Id. at 40; Berkshire Hills Regional School District Committee v. Berkshire Hills Education Association, 375 Mass. 522, 530 (1978). If, on the other hand, the Collective Bargaining Agreement can be construed in such a manner as to be consistent with the statute, so that an arbitrator could award relief enforcing the provisions of the agreement without interfering with adherence to the statute, then the parties are bound by contract and law to proceed to arbitration, and the Court must order them to do so. See, Bradley v. School Committee of Boston, 373 Mass. 53, 60 (1976).
Section 59B of G.L.c. 71, as amended by the Education Reform Act, provides in pertinent part as follows:
Principals . . . shall be the educational administrators and managers of their schools and shall supervise the operation and management of their schools and school property, subject to the supervision and direction of the superintendent. Principals employed under this section shall be responsible, consistent with district personnel policies and budgetary restrictions and subject to the approval of the superintendent, for hiring all teachers, instructional or administrative aides, and other personnel assigned to the school, and for terminating all such personnel, subject to review and prior approval by the superintendent and subject to the provisions of this chapter.
The school superintendent of a city or town or regional school district including vocation-technical schools, may also appoint administrators and other personnel not assigned to particular schools
Lowell reads this provision as giving principals sole and absolute authority for choosing those who will teach in their schools, as well as for determining the manner in which they will make that choice. Article XXVIIIA of the Collective Bargaining Agreement, Lowell reasons, interferes with that authority, and thus conflicts with the statute. It concludes, therefore, that §59B renders Article XXVIIIA completely void, so that its conceded refusal to follow Article XXVIIIA gives rise to no arbitrable dispute. The Union counters that §59B has no effect whatever on transfers, and that even if it does cover transfers, Article XXVIIIA remains enforceable at least with respect to its procedural requirements.
The obvious purpose of §59B is to give principals responsibility for the success of their schools, along with the authority they need to fulfill that responsibility. The power to select the members of a school’s faculty is the most critical element of that authority, since the success of a school, like that of a school system, “depends largely on the character and ability of the teachers.” Berkshire Hills Regional School District v. Berkshire Hills Education Association, 375 Mass. at 527, quoting Davis v. School Committee of Somerville, 307 Mass. 354, 362 (1940). In giving principals responsibility for “hiring all teachers,” the legislature recognized that teachers are not mere laborers, who might be viewed as fungible as long as they meet a minimal level of competence and diligence; teachers are professionals, whose individual strengths, skills, and approaches, in combination-with those of the other members of a school’s faculty, determine more than any other factor the character and quality of a school. In light of this recognition, and the overriding purpose of the statute, it is apparent that the phrase “hiring all teachers” in §59B includes the making of all decisions involving the selection of an individual to join a school’s faculty, whether the individual comes from outside the school system entirely, or transfers from another school in the system. See, Massachusetts Department of Education Advisory on School Governance, November 1995, p. 8 (“in light of Education Reform, we believe the principal should have discretion to approve the transfer of a teacher or other staff member into the school, just as with initial hiring”).
The Union points out that §59B does not use the word “transfer,” and that that word does appear elsewhere in the Education Reform Act, particularly in c. 71, §38, which provides that “[n)o school district shall require that an individual reside within the city, town, or regional school district as a condition of promotion, assignment, transfer, or continued employment ...” From this the Union reasons that the legislature distinguished between hiring and transfer, so that its use of the former term without the latter in §59B conveys *593 an intent to give the principal power over only initial hiring and not transfers.
This reasoning ignores the context of the words in the two provisions. The quoted portion of §38 refers to school districts, and addresses the district-wide issue of residency requirements. From a district-wide point of view, a transfer is entirely different from a new hire, since a new hire brings onto the payroll a person who was not there before, and eliminates a vacancy in the district, while a transfer merely shifts an individual, and a vacancy, from one school to another. In this context, a reference to hiring without specific reference to transfers would convey an intention to include one but not the other.[3] Section 59B, in contrast, deals not with the district as a whole, but with a single school. From the point of view of one school, and of a principal as its manager, a transfer from outside the school, albeit within the district, is precisely equivalent to a new hire, in that it brings a new person into the school, under the principal’s managerial authority, and eliminates a vacancy that the principal would otherwise have discretion to fill according to his or her own preferences. In this context, there would be no reason for the legislature to distinguish between transfers and initial hires; the phrase “hiring all teachers” encompasses both.
The Union also points to the phrase “assigned to the school” in §59B, and argues that this phrase gives the superintendent, or the school committee, the power to assign personnel employed in the district to a particular school, and that this power supercedes that of the principal to make hiring decisions for the school. Transfers pursuant to provisions in a collective bargaining agreement, the argument goes, are simply the assignment of personnel to a school, which the principal is bound to accept. This argument, too, ignores the context in which the quoted phrase appears. The phrase “assigned to the school” in §59B does not modify the reference to teachers, and does not limit the principal’s authority to hire teachers. Rather, §59B makes the principal responsible for “hiring all teachers” and “instructional and administrative aides,” without any reference to assignment, and then adds an additional, catch-all category of those the principal may also hire, described as “other personnel assigned to the school.” In context, it is clear that this phrase refers to personnel who are assigned to the particular school, as opposed to the district as a whole or a number of schools, other than teachers and instructional or administrative aides. The final sentence of §59B confirms this reading by describing those personnel whom the superintendent, rather than a principal, may appoint, as “administrators and other personnel not assigned to particular schools.”
Finally, the Union points out that the principal does not have complete discretion to determine who teaches in the school, because §59B and other provisions of the Act grant teachers certain protections against discharge, so that a new principal taking over a school assumes management of an existing faculty, the members of which the principal did not choose but cannot change except under limited circumstances and pursuant to specified procedures. This is obviously true, but does not aid in interpretation. The statute, like most others, reflects a legislative balance between competing purposes. The legislature gave principals responsibility for hiring and firing, but qualified the latter power with various specified procedural and substantive restrictions to protect those interests of teachers that it considered worthy of protection. The legislature provided no such protections for transfers, or for any transfer provisions of collective bargaining agreements.
The Court thus concludes that the principal’s responsibility “for hiring all teachers,” pursuant to G.L.c. 71, §59B, includes discretion to approve or disapprove teacher transfers, and that the statute makes that power non-delegable. See, Berkshire Hills Regional School District v. Berkshire Hills Education Association, 375 Mass. at 527-29, and cases cited.[4] This conclusion, however, does not end the controversy. While the city cannot, through collective bargaining, remove from the principal a discretionary power that the legislature has placed in that official, it can determine the manner in which a principal shall exercise that discretionary power, and the procedures to be followed in doing so, and can make that determination through collective bargaining. See, Berkshire Hills Regional School District v. Berkshire Hills Education Association, 375 Mass. at 528; Bradley v. School Committee of Boston, 373 Mass. at 57; Boston Teachers Union v. School Committee of Boston, 370 Mass. 455, 463 (1976). Indeed, Section 59B expressly confirms that authority by providing that the principal’s exercise of responsibility for hiring must be “conistent with district personnel policies.”[5] Thus, provisions of the Collective Bargaining Agreement governing the manner and procedure through which the principal approves transfer requests, as opposed to the principal’s substantive decision-making about any such request, do not conflict with the statute, and may be enforced.
The question remains whether the provisions of Article XXVIIIA of the Collective Bargaining Agreement govern the manner and procedure of transfer requests, and of action on those requests, as opposed to the substantive decision whether any such request is to be approved or not. Parts 1 and 2 of Article XXVIII A address posting and the form of requests. These provisions are obviously limited to process, and do not address the substance of any decision. In this case, moreover, the parties apparently agree that those parts of the article were followed, so that the Union’s grievance, and the disputed arbitration, does not relate to enforcement of those requirements. Part 4 is as clear, and as clearly procedural, as Parts 1 and 2; it merely requires “a written statement as to the dispo *594 sition” of each transfer request by a specified date. Part 4 expresses no requirement that reasons be given, but even if it were construed as requiring a statement of reasons, it would remain procedural, and capable of application in harmony with §59B. Here, the parties agree that the City did not comply, so all that remains for a grievance proceeding is the determination of a remedy for the noncompliance.
Parts 3 and 5 of Article XXVIIIA leave considerably more room for interpretation, and therefore pose more potential for interpretation in a manner that would bring them into conflict with §59B. By its plain terms, Part 3 merely sets forth a list of criteria that must “be considered" “when a transfer is to be made,” and directs that “(i]f all other variables are equal,” seniority within the Lowell system “shall be the controlling factor.” On its face, this provision does not require that any posted vacancy be filled through a transfer, as opposed to a new hire, nor does it dictate who is to consider the listed criteria or how they are to be weighed, nor does it prohibit the consideration of criteria in addition to those listed. Thus, Part 3 could be interpreted such that the principal alone considers the listed factors, along with whatever other lawful factors he or she considers relevant, weighs them as he or she sees fit, and decides, in his or her sole discretion, whether to fill the position with a transfer or a new hire, and if with a transfer, then which applicant. Under this interpretation, seniority would be controlling only if the principal decides to accept a transfer, as oppose a new hire, and then only if the principal decides that all other factors are equal, based on the principal’s subjective evaluation of those factors. The sole issue for the arbitrator, in enforcing Part 3 as so interpreted, would be whether the principal did in fact consider the listed factors, and did give controlling weight to seniority if the principal determined that all other variables were equal.
Interpreted in this manner, Part 3 is fully compatible with the nondelegable authority granted to the principal in §59B, and is therefore enforceable. Part 3 is also, however, susceptible of a very different interpretation, under which it would conflict with the statute. It might be read as granting teachers a contractual right to transfer, provided they meet minimum requirements with respect to the criteria specified, with seniority the deciding factor when more than one teacher requests the same position. Further, it might be considered to give any minimally qualified transfer applicant an entitlement to prevail over any outside applicant, and to empower the arbitrator to second-guess the principal’s judgment regarding application of the stated criteria. The City appears to assume that an arbitrator would adopt this interpretation, and that assumption seems to underlie its position that the entire Article conflicts with the statute.[6] The Union’s position on interpretation of the Article is less clear in its papers; its Memorandum at times hints at a theoiy of entitlement to transfer (e.g., its reference to “a seniority based transfer preference”) but at other points insists that the requirements of the Article are purely procedural.
The latter interpretation of Article XXVIII A.3. would clearly conflict with the nondelegable power of the principal to make hiring decisions, in precisely the way that the contract provision in Berkshire Hills Regional School District v. Berkshire Hills Education Association, 375 Mass. 522, entitling a teacher to promotion to principal over outside candidates, conflicted with the non-delegable authority of the school committee under the statute then in effect. It does not follow, however, from the possibility of an interpretation in conflict with the statute, that the Collective Bargaining Agreement provision is superceded, and that the dispute is not arbitrable. As indicated supra, the rule is to the contrary; if an interpretation is available that would not conflict with the statute, so that an arbitrator could grant lawful relief, the Court must refrain from interference with such enforcement. Such an interpretation is available with respect to Part 3 of Article XXVIII A.
Part 5 of Article XXVIIIA makes the decision of “the Superintendent, or his designee” “final, unless arbitrary or capricious.” In light of §59B, there can be no doubt that the superintendent’s “designee” is the principal, as required by statute. The provision for finality, subject to review on an “arbitrary and capricious” standard, like the provisions of Part 3, is open to varying interpretations, some consistent with and some in conflict with the principal’s authority under §59B.
“Arbitrary and capricious” is a familiar phrase in the law. In the context of judicial review of administrative action, it is a highly deferential standard, under which a court does not substitute its judgment for that of the executive agency, does not exercise any discretion of its own, and does not make any independent factual determination; rather, the court considers only whether the agency’s decision bears some rational relation to a legitimate policy within the agency’s statutory mandate, whether the agency’s factual determinations find some support in the evidence, and whether the decision is free from illegality. See, Seagram Distillers Co. v. Alcoholic Beverages Control Comm’n, 401 Mass. 713, 721 (1988) (and cases cited); Borden v. Commissioner of Public Health, 388 Mass. 707, 720-725, cert. denied 464 U. S. 936 (1983)(and cases cited). If the review provided for in Part 5 of Article XXVIII A follows that standard, it may be performed without impeding the principal’s exercise of statutory authority.[7] Like Part 3, however, Part 5 could be read as giving the reviewer — that is, the arbitrator — the power to second-guess the principal’s judgments, and to substitute his or her own. Such a reading would have the effect of shifting to the arbitrator the managerial authority the legislature has placed in the principal, and would therefore conflict *595 with the statute. Here again, however, as indicated supra, the possibility of such an interpretation does not make the dispute nonarbitrable; on the contrary, the availability of an interpretation consistent with the statute indicates that the Article remains enforceable, so that the dispute is subject to arbitration pursuant to the Collective Bargaining Agreement. Since such an interpretation exists with respect to each provision of Article XXVIII A, the Court cannot say that the Arbitrator could award no lawful relief as to any of those provisions, and accordingly must order the city to arbitrate the dispute as to each provision of the Article.
The City is understandably concerned that its submission to arbitration will lead to an arbitrator’s award that will reflect an erroneous interpretation of the Article, which will then be subject to judicial review only under the narrow standard of review applicable to arbitration decisions pursuant to G.L.c. 150 C, §11. The result, it fears, will be a defacto delegation of the principal’s statutory power, for which it will be without effective recourse. As the Supreme Judicial Court has said, however, “[t]he question whether the arbitrators acted in excess of the authority conferred on them ... is always open for judicial review." School Committee of West Springfield v. Korbut, 373 Mass. 788, 791-92 (1976). In light of §59B, the error the city fears would not be mere error of law, insulated from judicial review, but would be subject to vacation as action outside the arbitrator’s authority, in furtherance of collective bargaining provisions that, as interpreted, would be prohibited by statute.
ORDER
For the reasons stated, the plaintiffs motion for summary judgment is DENIED, and the defendant’s motion for summary judgment is ALLOWED. The parties are ordered to proceed to arbitration on the Union’s grievance.

At argument on the present cross-motions, the parties informed the Court that the arbitration hearing was scheduled to begin on April 14, 1997.

This is not to say that no dispute of fact exists with respect to the issues that would be before an arbitrator — that is, as to whether Lowell followed each of the procedures set forth in Article XXVIII A. At argument, Lowell’s position was that it had followed parts one through three, but not part four, and had refused to submit to the review contemplated by part five; the Union appeared to agree that parts one and two were followed, but not that part three was properly followed.

It should be noted that Section 38 does not refer to hiring of teachers at all; the decisions it exempts from residency requirements — promotion, assignment, transfer, continued employment — all relate to teachers already employed in the district.

The parties have brought to the Court’s attention only one other Superior Court decision addressing this issue, Lowell School Committee v. Local 159, SIEU, Middlesex Civil Action No. 94-3955 (Welch, J.). That decision reaches the same conclusion this Court reaches on this point. Counsel indicated at argument that that case is presently under advisement in the Appeals Court, as No. 96-P-1282.

The Union would read this statutory limitation as subjecting the principal’s hiring authority to any and all policies the school district might chose to adopt, both substantive and procedural. Under that reading the limitation would swallow the rule, permitting collective bargaining agreements to grant entitlements to certain categories of applicants, or to impose nondiscretionaxy scales for evaluating and ranking applicants according to set criteria, so that the principal’s responsibility for hiring would be a matter of form only. Such a reading would be in clear conflict with the intent of the legislature.

It may be that the City’s assumption is based on historical practice not reflected in the record before the Court.

As the Union’s counsel suggested at argument, such review might involve determination of whether a decision on a transfer request was based on nepotism, discrimination, or other unlawful factors.